1        **JS-6        'O'**

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11

12   REVEREND FATHER IAN ELLIOTT          Case No. 2:14-cv-00907-CAS-FFM

13   DAVIES; REVEREND J. EDWIN            **ORDER GRANTING**
     BACON, JR.; SHAKEEL SYED;            **PLAINTIFFS' MOTION FOR**
14                                        **PERMANENT INJUNCTION**
     RABBI HAROLD M. SCHULWEIS;           **(Dkt. 84)**
15   REVEREND TERA LITTLE; RABBI
16   JOHN ROSOVE; REVEREND PETER
17   LAARMAN; DAVID N. MYERS;
18   AND RABBI AMY BERNSTEIN,

19              *Plaintiffs*,

20         v.

21
     LOS ANGELES COUNTY BOARD
22   OF SUPERVISORS; AND WILLIAM
23   T. FUJIOKA,

24              *Defendants*.

25

26

27

28

# I.

## INTRODUCTION

On February 6, 2014, plaintiffs Reverend Father Ian Elliott Davies, Reverend J. Edwin Bacon, Jr., Shakeel Syed, Rabbi Harold M. Schulweis, Reverend Tera Little, Rabbi John Rosove, Reverend Peter Laarman, David N. Myers, and Rabbi Amy Bernstein (collectively, "plaintiffs") filed the instant action against defendants Los Angeles County Board of Supervisors ("the Board" or "the County"), and County Chief Executive Officer William T. Fujioka (collectively, "defendants"). Dkt. 1 (Complaint). In brief, plaintiffs allege that the Board's January 7, 2014 motion approving the restoration of a Latin cross to the official County seal by placing the cross atop the seal's depiction of the San Gabriel Mission violates (1) the No Aid Clause of article XVI, section 5 of the California Constitution; (2) the No Preference Clause of article I, section 4 of the California Constitution; and (3) the Establishment Clause of the First Amendment to the United States Constitution. See Complaint at ¶¶ 9, 38-49.

On September 17, 2015, plaintiffs filed the instant motion for a permanent injunction. Dkt. 84 ("Motion").[1] On October 8, 2015, defendants filed an opposition to plaintiffs' motion. Dkt. 97 ("Opp'n").[2] On October 19, 2015,

---

[1] In support of their motion for a permanent injunction, plaintiffs filed the following declarations: Dkt. 85 (Declaration of Reverend Father Ian Elliott Davies ("Davies Decl.")); Dkt. 86 (Declaration of Reverend J. Edwin Bacon, Jr. ("Bacon Decl.")); Dkt. 87 (Declaration of Shakeel Syed ("Syed Decl.")); Dkt. 88 (Declaration of Reverend Tera Little ("Little Decl.")); Dkt. 89 (Declaration of Rabbi John Rosove ("Rosove Decl.")); Dkt. 90 (Declaration of Reverend Peter Laarman ("Laarman Decl.")); Dkt. 91 (Declaration of David N. Myers ("Myers Decl.")); Dkt. 92 (Declaration of Rabbi Amy Bernstein ("Bernstein Decl.")); Dkt. 93 (Declaration of Michael J. Gonzalez, Ph. D. ("Gonzalez Decl.")); Dkt. 94 (Declaration of Jeffrey S. Siker, Ph. D. ("Siker Decl.")); Dkt. 95 (Declaration of Jill Vesci ("Vesci Decl.")); and Dkt. 96 (Declaration of Linda M. Burrow ("Burrow Decl.")).

[2] In support of their opposition to the instant motion, defendants filed the following declarations: Dkt. 98 (Declaration of John Dietler, Ph. D. ("Dietler Decl.")); Dkt. 99 (Declaration of Stephen W. Hackel, Ph. D. ("Hackel Decl.")); Dkt. 100 (Declaration of Frank J. Ozello ("Ozello Decl.")); Dkt. 101 (Declaration of Lori Glasgow, Ph. D. ("Glasgow Decl.")); Dkt. 102 (Declaration of Jho-

plaintiffs filed a reply.  Dkt. 121 ("Reply").  On November 10, 2015, the Court held a one-day bench trial.[3]  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

---

An Ignacio ("Ignacio Decl."); Dkt. 103 (Declaration of David Sommers ("Sommers Decl."); Dkt. 104 (Declaration of Gerardo Ramirez ("Ramirez Decl.")); Dkt. 105 (Declaration of Susan Herman ("Herman Decl."); Dkt. 106 (Declaration of Joseph M. Nicchitta ("Nicchitta Decl.")); Dkt. 107 (Declaration of Ernestina Rhind ("Rhind Decl.")); Dkt. 108 (Declaration of Adela Guzman ("Guzman Decl.")); Dkt. 109 (Declaration of Kenneth A. Maranga ("Maranga Decl.")); and Dkt. 110 (Declaration of Timothy T. Coates ("Coates Decl.")).  In addition, defendants filed objections to plaintiffs' declarations.  See Dkts. 111-117.  In particular, defendants object to the testimony of one of plaintiffs' three experts, Jill Vesci, who offers her opinion as an architectural historian.  See Dkt. 117 (Defendants' Objections to Vesci Decl.).  Pursuant to Federal Rule of Evidence 702(a), defendants object to Vesci's testimony on the grounds that she lacks the requisite expertise, knowledge, skill, training, or education necessary to testify about the "architectural history of the Mission."  Id.  Defendants contend that Vesci's deposition testimony revealed that she (1) received no formal education in the history of California Missions or the San Gabriel Mission, (2) has no specialized knowledge or teaching experience regarding mission architecture, (3) does not consider herself to be an expert on California missions, and (4) has never served as an expert in any field.  Id. at 2-3.  Defendants further argue that Vesci's testimony is not the result of reliable principles and methods, and therefore is not based on sufficient facts or data.  Id. at 3 (citing Fed. R. Evid. 702(b)-(d)).  Without reaching the merits of defendants' objections, the Court notes that it has not cited or otherwise relied upon Vesci's testimony in reaching its findings and conclusions here.

[3] Throughout this order, the Court cites to exhibits included in the parties' Joint Exhibit List, dkt. 144, as follows: "Tr. Ex. [Exhibit Number]."  Defendants lodge blanket objections, under Federal Rules of Evidence 602 (Need for Personal Knowledge) and 901 (Authentication), to many of plaintiffs' exhibits, including documents that defendants produced in discovery and that plaintiffs attached as exhibits to the Declaration of Linda M. Burrow.  See Dkt. 112 (Defendants' Objections to Burrow Decl.).  Of course, "[a]uthentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.' "  Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Evid. 901(a)).  A proper foundation need not be established through personal knowledge, but may rest on any manner permitted by Federal Rule of Evidence 901(b) or 902.  See Fed. R. Evid. 901(b) (providing ten approaches to authentication); Fed. R. Evid. 902 (self-authenticating documents need no extrinsic foundation).  Documents that are produced in response to discovery requests and that contain certain indicia of reliability may be deemed authentic when later offered by a party-opponent.  See Orr, 285 F.3d at 777 ("Authentication can also be accomplished through judicial admissions such as . . . production of items in response to . . . [a] discovery request.") (quoting 31 Federal Practice & Procedure: Evidence § 7105, at 39); Maljack Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996) (documents bearing a party's letterhead that were produced by the party in discovery were deemed authentic when offered by the party-opponent); Snyder v. Whittaker Corp., 839 F.2d 1085, 1089 (5th Cir. 1988) (same).  To the extent the Court relies upon plaintiffs' documentary evidence (in particular, documents produced by defendants in discovery), the Court

3.

## II.

## FINDINGS OF FACT[4]

Plaintiffs are citizens and taxpayers of the County of Los Angeles who regularly come into contact with the County Seal.  See Davies Decl. at ¶ 2; Bacon Decl. at ¶ 2; Syed Decl. at ¶ 2; Little Decl. at ¶ 2; Rosove Decl. at ¶ 2; Laarman Decl. at ¶ 2; Myers Decl. at ¶ 2; and Bernstein Decl. at ¶ 2.  Defendant Los Angeles County Board of Supervisors is the governing body of the County of Los Angeles.  In 2014, when the instant suit was filed, defendant William T. Fujioka served as the Chief Executive Officer of the County of Los Angeles, and the Board of Supervisors consisted of the following five elected members:  Supervisor Gloria Molina (District No. 1), Supervisor Mark Ridley-Thomas (District No. 2), Supervisor Zev Yaroslavsky (District No. 3), Supervisor Don Knabe (District No. 4), and Supervisor Michael D. Antonovich (District No. 5).[5]  Tr. Ex. 67.

On January 2, 1957, the Board of Supervisors adopted a new official seal for the County of Los Angeles (the "1957 Seal").  Tr. Ex. 7.  The 1957 Seal was designed by former Supervisor Kenneth Hahn and depicted, among other things, an image of the Hollywood Bowl, with two stars and an unadorned Latin cross situated in the sky above it.  Id.  According to official County documents, the depiction of the Hollywood Bowl on the 1957 Seal represents cultural activities, and the two stars represent the motion picture and television industries.  Id.  It is unclear from

---

deems these items to be authentic under either Federal Rules of Evidence 901(b)(4) (noting the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," may support a finding of authenticity) or 902(1)-(2) (noting certain domestic public documents are self-authenticating).

[4] To the extent necessary, each of these findings of fact may be deemed to be a conclusion of law.

[5] Defendant William T. Fujioka was sued in his official capacity as County Chief Executive Officer and has since resigned from this position.  Dkt. 127.  Pursuant to Federal Rule of Civil Procedure 25(d), Sachi Hamai, Fujioka's successor, is automatically substituted as a defendant in this action.  Subsequent proceedings should be in the substituted party's name.  Fed. R. Civ. P. 25(d).

the record whether the unadorned Latin cross was meant to represent "the influence of the church and missions of California," id., or, more simply, religion.[6]  In addition to the cross, the 1957 Seal also depicted an image of Pomona, "the goddess of gardens and fruit trees," to represent agriculture; the Spanish galleon *San Salvador*, which sailed into San Pedro Harbor on October 8, 1542; a tuna, to represent the fishing industry; the champion cow Pearlette, to represent the dairy industry; engineering instruments, to represent the County's "contribution to the conquest of space"; and oil derricks, to represent oil fields discovered on Signal Hill.  Id.

---

[6] Plaintiffs argue that the Board of Supervisors originally included the Latin cross on the 1957 Seal for religious purposes.  In support of this contention, plaintiffs rely upon a letter from the County Chief Clerk, dated February 28, 1957, filing the 1957 Seal with the California Secretary of State.  See Tr. Ex. 9.  The letter states that it is being forwarded "in conformance with Part 2 of the Government Code, Paragraph 25004, which provides that a description and impression of the Seal shall be filed in the office of the County Clerk and the Secretary of State."  Id.  The body of the letter lists the following eight items as having been "specified" by the 1957 Seal's artist, Millard Sheets, on the "mat" of the original design: "Agriculture"; "Earth, Sea, and Sun"; "Oil and Galleon"; "Hollywood Bowl"; "*Religion*"; "Dairy Farming"; "Fishing"; and "Industry."  Id. (emphasis added).  It is unclear from the record whether or not the artist of the 1957 Seal was a County employee.  The County objects to plaintiffs' reliance upon this document, arguing, among other things, that the document is not properly authenticated and contains inadmissible hearsay— i.e., the statement that the cross on the Seal symbolizes "[r]eligion."  See Dkt. 112, Objection No. 4 (citing Fed. R. Evid. 602, 801, 802, 901).  However, pursuant to the Court's discussion supra at n.3 and Federal Rule of Evidence 901(b)(4), the Court finds no reason to question the authenticity of the document, which defendants themselves produced and which contains "distinctive characteristics" indicative of its authenticity.  Fed. R. Evid. 901(b)(4).  Furthermore, the statements contained therein are not excluded by the rule against hearsay for at least two reasons.  First, the statements fall under an exception to the rule against hearsay, as they are included "in a document that is at least 20 years old and whose authenticity is established."  Fed. R. Evid. 803(16).  Second, the statements in the document are not offered for their truth, but rather as an official statement of the County, filed pursuant to California Government Code section 25004.  See Cal. Gov't Code § 25004 (stating Board of Supervisors "may adopt a seal" and that "[a] description and impression of the seal shall be filed in the office of the county clerk").  In addition, the statements contained in the document were publicly referenced by Supervisor Yaroslavsky during the Board's 2004 meetings, and therefore inform the reasonable, objective observer's perception of the reasons for the County's revisions of the seal.  See Tr. Ex. 13 (June 8, 2004 Board Meeting Minutes), at 203 (stating that the County in its 1957 filings with the Secretary of State had "explained what the cross stood for" and "didn't say [the cross] was part of our history, to represent our history," but rather said "one word. . . Religion").

The 1957 Seal served as the County's official seal until 2004. On May 19, 2004, the ACLU Foundation of Southern California ("ACLU") sent a letter to County officials stating that the presence of the cross on the 1957 Seal "reflects an impermissible endorsement of Christianity by the County" and was therefore unconstitutional. See Tr. Ex. 11. In its letter, the ACLU also indicated that it "was prepared to negotiate a reasonable time frame" for the 1957 Seal's replacement, but would file suit against the County if it did not agree to remove the Latin cross. Id.

On June 1, 2004, during a closed session of the Board of Supervisors, the five members of the Board voted 3-2 to instruct County Counsel to "negotiate with the ACLU" to determine whether the ACLU would refrain from filing suit if the County were to (1) add to the seal "a representation of the region's indigenous peoples," and (2) replace the Latin cross "with a depiction of a California mission."[7] Tr. Ex. 82.

On June 8, 2004, at one of several public meetings wherein the Board discussed potential revisions to the 1957 Seal, the Board heard testimony from members of the public, many of whom objected to the removal of the Latin cross on religious grounds. See Tr. Ex. 13 (June 8, 2004 Board Meeting Minutes), at 86 ("If there's no cross, there's no compromise."), 101 ("This is an attack on the body of Christ."), 112 ("My lord and savior died on that cross and it would be horrible for me to just let it be erased."), 135 ("The cross represents not just the passion that we are presenting today but the passion of Christ and [that] this is a Christian nation."), 187 ("It's a symbol of the love of Christ.").

---

[7] At the time, the Board consisted of the following five members: Supervisor Gloria Molina (District No. 1), Supervisor Yvonne Burke (District No. 2), Supervisor Zev Yaroslavsky (District No. 3), Supervisor Don Knabe (District No. 4), and Supervisor Michael D. Antonovich (District No. 5). With the exception of Supervisor Burke, who was later replaced by Supervisor Mark Ridley-Thomas, the composition of the Board remained unchanged through the filing of the instant lawsuit on February 6, 2014.

Following the time for public comment, each of the five members of the Board shared his or her views on revising the 1957 Seal.  Supervisor Michael D. Antonovich stated his view that "[t]he cross is a part of a historical fact with the founding of the County of Los Angeles, just as the Star of David on the Sheriff's badge is a reflection of . . . the Judaic heritage and the laws of Moses."  Id. at 192-93; see also id. at 194 (stating that the 1957 Seal "reflects the historical nature of the County of Los Angeles"), 219 ("The County Seal does not lack historical significance and it's just reporting a historical fact."), 219 ("In this case, it's reflecting a historical fact on the County of Los Angeles and there's been no Supreme Court decision that outlaws that.").  Regarding the proposed changes to the seal, Antonovich stated that "[i]f you replace [the cross] with a mission without a cross[,] that's not a mission anymore."  Id. at 219-20.  He also noted "additional problems" related to "the costs [of] redoing a county seal," asking, "why should we spend time and effort to make replacements when our time and effort ought to be spent in getting those resources to keep the libraries open, to get the children adopted, and to help public safety?"  Id. at 193, 220.  Antonovich further stated that changing the 1957 Seal might expose the County to liability for infringing upon the original artist's intellectual property rights in the depiction, to the extent any such rights existed.  Id. at 193.  Accordingly, Antonovich proposed a motion to seek additional, outside legal counsel regarding the constitutionality of the 1957 Seal, and to reject the proposal to amend the seal.  Id. at 195.

Supervisor Don Knabe then stated that the legal issues presented by the 1957 Seal were "debatable," further asserting as follows:

> The issue is, where does it all end?  And I think this Board needs to stand up and say, wait a minute.  We have a great history in this County.  We have a great history of our people in this County, in this state, and enough is enough.

Id.

Comments from Supervisor Zev Yaroslavsky followed.  Yaroslavsky stated that in its 1957 filings with the Secretary of State, the County had "explained what the cross stood for" and "didn't say [the cross] was part of our history, to represent our history.  It was one word.  They said Religion." Id. at 203.  Yaroslavsky further stated that although he had been called "anti-Christian" and "insensitive to our history" by members of the public, he felt that "part of a responsible governing body is to be able to stand up like grown men and women and take a legal opinion for what it is." Id. at 197.  Regarding the proposal to remove the cross and add an image of a mission, Yaroslavsky stated:

> If we're talking about the history of Los Angeles County and the role that the missionaries played in the development, in the settlement of California in the 18th and 19th century, and it is clearly a part of our history, then a mission depicts that history as much as anything. If you don't believe that a mission is a sufficient symbol to represent the history, if you believe alternatively, as I think I said in closed session last week, that the only way to represent the history of L.A. County, as it relates to the missionaries, is with a religious symbol of the Latin cross, you've got a constitutional problem.

Id. at 202.  Yaroslavsky further stated that "if the issue is history and not religion, then there are a thousand and one ways to depict history and I think we chose a pretty good one." Id. at 203.

Supervisor Yvonne Burke characterized the June 8, 2004 meeting, which included many interruptions by members of the public, as a "religious frenzy" and "as close to the inquisition as we have seen in the 21st century." Id. at 209, 211. She added,

> I've listened here for a few hours and I kept thinking that,
> if this case goes to trial, I would hate for them to play this
> hearing because, if there's ever any question of what was
> being moved forward and what the objection was to the
> vote that had been taken, it was clearly, it was a religious
> one.

See id. at 209.  Supervisor Gloria Molina also noted the "emotional" and "religiously charged" nature of the hearing.  Id. at 214.  She added that although she did not "feel that strongly about [the 1957 Seal]," which she felt didn't "reflect who [she was] or who we are as a county," she felt "very strongly" that she was "upholding the Constitution" in supporting removal of the cross.  Id. at 214, 217. Ultimately, the Board decided to make an administrative request of the County Chief Administrative Office and County Counsel to investigate and report back regarding a process for adopting a new County seal.  See Tr. Ex. 83.

Over three months later, on September 14, 2004, the County Chief Administrative Officer sent a letter to the Board recommending that it approve and adopt a proposed new County seal, which came attached to the letter.  See id.  The proposed new seal (the "2004 Seal") (1) removed the unadorned Latin cross from above the Hollywood Bowl; (2) replaced the image of the oil derricks with a sketch of the eastern façade of the San Gabriel Mission ("the Mission"), without any cross atop its roof; and (3) replaced the goddess Pomona with an image of a Native American woman carrying a basket.  See Tr. Ex. 25; see also Tr. Exs. 82-83.  At the time, the actual San Gabriel Mission's eastern façade was not adorned by a cross. See Dietler Decl. at ¶ 36; Hackel Decl. at ¶ 101.

Also on September 14, 2004, the Board held a public meeting regarding whether the County should adopt the Chief Administrative Officer's proposed seal. Tr. Ex. 24.  During this meeting, Supervisor Knabe called the existing depiction of the cross on the 1957 Seal "a reflection of the history of this great County."  Id. at 297.  Knabe accordingly expressed concern that the Board was "trying to change

the course of history . . . ."  Id.  Supervisor Antonovich likewise stated that "[f]or 50-plus years, there's not been a problem with . . . having a seal that signified a historical foundation of the County of Los Angeles."  Id. at 292; see also id. ("The old saying, if it isn't broken, don't fix it.").  Antonovich also took issue with the proposed new seal's depiction of the San Gabriel Mission, noting that the depiction did not include a cross:

> What is depicted is a back door, the rear end of the church.  That is not the symbol of the Mission.  The symbol of the Mission was an open door to bring the good news and it was a fact that it reflects the historical significance of the County of Los Angeles.

Id. at 294-95.[8]

During the public meeting, the County Administrative Officer stated that a "good figure" for the estimated cost of adopting the 2004 Seal throughout the County was $800,000.  Id. at 292-93.  Ultimately, the Board voted 3-2 in favor of the proposed revisions, with Supervisors Burke, Molina, and Yaroslavsky voting to pass the motion, and Supervisors Antonovich and Knabe voting against it.  See id. at 309-10.

On October 26, 2004, the County Chief Administrative Officer sent the Board a final cost estimate of $700,000 to replace the County seal on County-owned and leased facilities, decals affixed to County vehicles, and all computer applications, including websites, electronic letterhead, and software.  Tr. Ex. 27. Thereafter, the 2004 Seal was adopted throughout the County.[9]

---

[8]  Christians often refer to the gospel (the four books in the Bible that describe the life of Jesus Christ) as the "good news" of redemption through Jesus's life and death.  See Davies Decl. at ¶ 4. The term "gospel" derives from Greek, Old English, and Middle English words meaning, "good news."  Id.

[9]  In 2004, a resident and employee of the County filed a lawsuit against the Board of Supervisors and the County of Los Angeles alleging that the "removal of the cross from the seal conveyed a

In 2009, a Latin cross was placed atop the eastern façade of the actual San Gabriel Mission.  See Hackel Decl. at ¶ 101; Dietler Decl. at ¶ 36.

On December 31, 2013, Supervisors Antonovich and Knabe introduced a motion to add a Latin cross atop the depiction of the Mission on the 2004 County Seal.  See Tr. Ex. 36 (Motion); see also Rhind Decl. at Ex. 1, pp. 4-6 (same).  The motion reads, in relevant part, as follows:

> The current rendering of the Mission on the seal is aesthetically and architecturally inaccurate.  At the time that the seal was redesigned in 2004, the cross had been missing from the top of the mission since 1989 when it was taken down to retrofit the structure after damage from the Whittier Narrows earthquake.  The cross was returned to the top of the Mission in 2009 after being lost for decades.

> WE, THEREFORE, MOVE that the Board of Supervisors direct the Chief Executive Officer to make the County seal artistically, aesthetically and architecturally correct by placing the cross on top of the San Gabriel Mission in order to accurately reflect the cultural and historical role that the Mission played in the development of the Los Angeles County region.

Tr. Ex. 36.  The motion did not address the accuracy of the other images on the 2004 Seal, and Supervisors Antonovich and Knabe proposed no other changes to the seal.  See id.  The motion did not cite any confusion by constituents regarding the existing depiction of the Mission (without a cross) on the 2004 Seal.  Id.

---

state-sponsored message of hostility toward Christians" and thereby violated the Establishment Clause of the First Amendment.  Vasquez v. Los Angeles Cty., 487 F.3d 1246, 1248 (9th Cir. 2007).  The district court dismissed the action with prejudice, and the Ninth Circuit later affirmed, finding that defendants' "removal of the cross is more reasonably viewed as an effort to restore their neutrality," "ensure their continued compliance with the Establishment Clause," and "avoid unwanted future litigation."  Id. at 1257.

One week later, on January 7, 2014, the Board held a public meeting regarding the motion brought by Supervisors Antonovich and Knabe to add the cross to the 2004 Seal's depiction of the Mission.  See Tr. Ex. 52 (January 7, 2014 Board Meeting Minutes).  During the period for public comment, some members of the public referenced the County's 2004 revisions to the 1957 Seal.  See id. at 378 ("I liked the old seal and I fought to keep it the way it was . . . [and] am glad and sad at the same time to see that item back on the agenda because it never should have been [sic]."), 380 ("[T]his is obviously a very controversial issue.  This would be a decade later that we are re-visiting it.").  The ACLU publicly opposed the motion during the meeting.  See id. at 380 (Comments of the ACLU's Peter Eliasberg) ("[T]he government is returning a sectarian religious symbol to a seal less than ten years after its removal and one of the major objections to the removal in the first place [was] very strong religious objection[.]"); see also Ramirez Decl. at Ex. 1, p. 4.

Supervisor Antonovich stated that he and Supervisor Knabe introduced the motion "to make a historical correction on [the 2004] seal."  Tr. Ex. 52, at 383.  Specifically, Antonovich described the motion as an attempt to place "a proportionately accurate cross at the apex of the [Mission's] roof . . . in order to accurately reflect the cultural and historical role that the Mission played in the development of Los Angeles County's region."  Id. at 374, 384 ("[W]e are not changing anything other than the cross.").

Later in the public meeting, Antonovich elaborated as follows:

> The purpose of the Municipal Seal [is to] accurately reflect[] the municipality's history and culture.  As you can see behind me, Ventura County, San Benito County, and San Luis Obispo City, they have seals that also have a cross on top of the missions.  Because it reports a historical fact. . . . We all know that the County of Los Angeles' beginnings began in the San Gabriel Mission . . .

12.

So what we have is correcting a situation where the Mission has the cross.  Because it is historical, we are not adding—we are reflecting upon a historical event that occurred in the creation of th[e] County of Los Angeles.

Id. at 382.

Supervisor Yaroslavsky, who a decade earlier had voted to remove the unadorned Latin cross from the 1957 Seal and to adopt the 2004 Seal, stated as follows:

[B]ecause we removed the [cross from the 1957 Seal] in 2004, . . . restoring it now represents a higher burden on our part to defend the principal symbol of a religion on our seal.  The issue of accuracy is an interesting one but it's not a constitutional one.  Whether the mission is accurately depicted in every aspect or whether the Hollywood Bowl is accurately depicted in every aspect, which it is not, or the [cow Pearlette] is accurately reflected, which she is not, is not a constitutional issue; it's a judgment call by the Board.  What is a constitutional issue is the placement of a symbol, a principal symbol of a religion on a county seal.

***

[T]his is not just about history; it's about the cross.  And to say anything different would be really somewhat disingenuous because if we really wanted to talk about the history of the role that the Missionaries played in Southern California in the 1700s, we could put a depiction of Father Junipero Serra on the seal.  We could put a depiction of the *pobladores* walking through the San Gabriel Valley towards what would become Los Angeles.  We could even put Angels.  Angels are not the principal symbol of any particular religion.  There are 100 ways which we could depict that history.  But the one that's been chosen here is the cross.

13.

Id. at 386-87.

Ultimately, the Board voted 3-2 in favor of the proposed addition of the cross, with Supervisors Antonovich, Knabe, and Ridley-Thomas voting in favor of the motion, and Supervisors Molina and Yaroslavsky voting against it.[10]  See Rhind Decl. at Ex. 1, pp. 4-6; Tr. Ex. 52, at 389-90.  The only change made to the Seal in 2014 was the addition of the Latin cross.

On January 15, 2014, "[c]onsistent with the instructions issued in 2004 [regarding implementation of the 2004 Seal]," then-County Chief Executive Officer William T. Fujioka instructed County department heads to "use the new County seal wherever possible and appropriate."  See Tr. Ex. 67.  The County subsequently used public resources to design and implement the 2014 Seal.  See id.  On June 3, 2014, and again in late 2014 and early 2015, the County represented to plaintiffs that it would "voluntarily cease *further* implementation" of the 2014 Seal pending the outcome of this action.  See Ozello Decl. at ¶¶ 2-6 (emphasis added), Exs. 1-4; Burrow Decl. at ¶¶ 50-53, Exs. 57-58; Ramirez Decl. at ¶ 4, Ex. 2.[11]

---

[10] As stated supra, Supervisor Mark Ridley-Thomas succeeded Supervisor Yvonne Burke, who had in 2004 voted with Supervisors Yaroslavsky and Molina to adopt the 2004 Seal and thereby remove the unadorned Latin cross from the seal.

[11] Plaintiffs argue that despite its agreement to cease further implementation of the new seal, the County "flouted their self-imposed stay" by continuing to use the 2014 Seal on signage that was created after June 2014, as well as on official County webpages that are "continually updated" but from which the 2014 Seal has not yet been removed.  See Motion at 7, 19 n.10.  In particular, plaintiffs contend that Supervisors Antonovich and Knabe continued to use the 2014 Seal despite the agreement to stay further implementation, purportedly displaying it on websites and at public appearances, and by posting it on stationery, pamphlets, and other official publications.  Id. at 19 n.10.  Plaintiffs contend that the County's purported willingness to violate the voluntary stay further warrants imposition of an injunction here.  Defendants challenge plaintiffs' assertions, arguing that plaintiffs have failed to demonstrate that the County has, at any point, actually violated its agreement to cease *further* implementation of the 2014 Seal.  See Opp'n at 25-27.  According to the County, the evidence upon which plaintiffs rely consists entirely of items either not produced by the County, or of stationery, website templates, and other design templates that the County changed prior to the voluntary stay.  Id. at 26 (citing Guzman Decl. at ¶¶ 3-4; Sommers Decl. at ¶¶ 3-7; Ignacio Decl. at ¶¶ 2-5; Ramirez Decl. at ¶¶ 3-4, Exs. 1-2; and Herman Decl. at ¶¶ 3-9).  In light of the evidence before it, the Court cannot conclude, despite plaintiffs' contentions to the contrary, that the County has in fact violated its agreement to cease *further*

**III.**

**CONCLUSIONS OF LAW[12]**

**A.    Plaintiffs Have Standing to Bring the Instant Action**

To have standing to challenge the Board's addition of the cross to the County seal, plaintiffs must suffer "an injury in fact that is fairly traceable to the challenged conduct, and it must be likely that the injury would be redressed by a favorable decision."[13]  <u>Buono v. Norton</u>, 371 F.3d 543, 546 (9th Cir. 2004) (citations and quotation marks omitted).  Because an "allegedly improper expenditure of municipal funds" in support of an action that is alleged to violate the Establishment Clause is a sufficient injury in fact, the Ninth Circuit has held that plaintiffs have standing to pursue equitable actions against municipalities if they can demonstrate their status as municipal taxpayers.  <u>Cammack v. Waihee</u>, 932 F.2d 765, 770, 772 (9th Cir. 1991) (holding that state and municipal taxpayers had standing to challenge constitutionality of statute declaring Good Friday a state holiday).  Plaintiffs in the instant action have standing as municipal taxpayers to challenge the constitutionality of the 2014 Seal because they pay property taxes to the County.  <u>See supra</u>; <u>We Are Am. v. Maricopa Cnty. Bd. of Supervisors</u>, 297 F.R.D. 373, 383 (D. Ariz. 2013) (establishing plaintiff's standing as a municipal taxpayer where plaintiff paid property tax on a residence in the county).  Under certain circumstances, taxpayers also have standing under state law to challenge the illegal expenditure of public funds.  <u>See</u> Cal. Code Civ. Proc. § 526a.

In addition, the "spiritual harm resulting from unwelcome direct contact with an allegedly offensive religious [] symbol is a legally cognizable injury and suffices to confer Article III standing."  <u>Vasquez</u>, 487 F.3d at 1253.  Each Plaintiff has

---

implementation of the 2014 Seal.  The record on this point is ambiguous, at best.

[12] To the extent necessary, each of these conclusions of law may be deemed a finding of fact.

[13] The Court notes that defendants do not challenge plaintiffs' standing to bring the instant action.  <u>See generally</u> Opp'n.

testified to having suffered spiritual harm from the County's 2014 addition of the Latin cross to the 2004 Seal.  See Davies Decl. at ¶¶ 6-8; Bacon Decl. at ¶ 6; Rosove Decl. at ¶¶ 4-5; Syed Decl. at ¶¶ 4-6; Little Decl. at ¶ 4; Laarman Decl. at ¶¶ 4-10; Myers Decl. at ¶¶ 6-12; and Bernstein Decl. at ¶ 4.  Accordingly, plaintiffs have standing to bring the instant action.

**B.     Plaintiffs Are Entitled to Injunctive Relief**

"An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 32 (2008) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law")).  "[T]he balance of equities and consideration of the public interest" are "pertinent in assessing the propriety of any injunctive relief, preliminary or permanent."  Id. at 32; see Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that [for a preliminary injunction] the plaintiff must show a likelihood of success on the merits rather than actual success.").  Specifically, "[u]nder 'well-established principles of equity,' a plaintiff seeking permanent injunctive relief must satisfy a four-factor test by showing: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv., 789 F.3d 1075, 1088 (9th Cir. 2015) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

The County appears only to challenge plaintiffs' contention that they have demonstrated success on the merits.  That is, defendants do not argue in their

opposition that plaintiffs have failed to establish irreparable harm; do not dispute that the balance of hardships favors entry of a permanent injunction; and do not deny that an injunction is in the public interest.  For reasons explained below, the Court concludes that plaintiffs have satisfied the standard for injunctive relief:  (1) they have demonstrated success on the merits because the addition of the cross to the 2004 Seal violates both the California and United States constitutions; (2) they have suffered an injury in fact and will continue to suffer irreparable harm in the absence of an injunction, see Klein v. City of San Clemente, 584 F.3d 1196, 1208 (9th Cir. 2009) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (citation and internal alterations omitted); (3) the balance of equities tips in plaintiffs' favor, see Sammartano v. First Judicial Dist. Court, in & for Cnty. of Carson City, 303 F.3d 959, 973 (9th Cir. 2002) ("the balance of hardships tips sharply" toward plaintiffs in First Amendment cases); and (4) an injunction is in the public interest, see id. at 974 (recognizing "the significant public interest in upholding First Amendment principles").  See Winter, 555 U.S. at 20; see also MercExchange, 547 U.S. at 391.

**1.      Plaintiffs Have Demonstrated Success on the Merits**

**a.      The Constitutional Avoidance Doctrine**

In the instant motion, plaintiffs argue that the County's addition of the Latin cross to the 2004 Seal violates the No Aid and No Preference Clauses of the California Constitution, as well as the Establishment Clause of the First Amendment to the United States Constitution.[14]  Under the constitutional avoidance doctrine, courts "should avoid adjudication of federal constitutional claims when alternative state grounds are available," Vernon v. City of Los Angeles, 27 F.3d 1385, 1391-92 (9th Cir. 1994), including "when the alternative ground is one of

---

[14] Plaintiffs do not assert a claim under the Establishment Clause of article I, section 4 of the California Constitution.

17.

state constitutional law," Ellis v. City of La Mesa, 990 F.2d 1518, 1524 (9th Cir. 1993).  In light of the constitutional avoidance doctrine, the Ninth Circuit has, at times, declined to reach federal constitutional claims when alternative state constitutional grounds exist.  See, e.g., Carpenter v. City & Cnty. of San Francisco, 93 F.3d 627, 629, 632 (9th Cir. 1996) (declining to reach plaintiff's federal constitutional claims because "the religion clauses of the California Constitution are read more broadly than their [federal] counterparts" and the Court had already held "that the Cross violates the No Preference Clause"); Hewitt v. Joyner, 940 F.2d 1561, 1565 (9th Cir. 1991) (declining to address federal constitutional claims after holding that the county's ownership of a park featuring religious statues violated California's No Aid and No Preference Clauses).  Plaintiffs accordingly contend that because the County's conduct runs afoul of the California Constitution, the Court need not reach plaintiffs' claims under the United States Constitution.

However, in light of the relative dearth of authority assessing the constitutionality of governmental displays under the No Aid and No Preference Clauses of the California Constitution—and in consideration of the fair number of cases to have considered federal Establishment Clause challenges to the display of Latin crosses on county and municipal seals—the Court finds it prudent to reach the merits of both plaintiffs' state and federal claims.  C.f. Am. Humanist Ass'n v. City of Lake Elsinore, No. 5:13-CV-00989-SVW, 2014 WL 791800, at *5-*6 (C.D. Cal. Feb. 25, 2014) (Wilson, J.) (applying the Lemon test to plaintiffs' California and federal constitutional claims in part because those few California cases assessing religious displays under the No Preference Clause were factually distinct and accordingly not instructive).

/ / /

/ / /

/ / /

18.

**b.     The No Aid Clause of the California Constitution**

**i.      The No Aid Clause Prohibits the County from Granting a Benefit to a Sectarian Purpose, Irrespective of the County's Purported Secular Purpose**

Plaintiffs first argue that the addition of the cross to the 2004 Seal violates the No Aid Clause of article XVI, section 5 of the California Constitution.[15]  The No Aid Clause provides, in relevant part, that "[n]either the Legislature, nor any county . . . shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or *in aid of any religious sect, church, creed, or sectarian purpose*."  Cal. Const. art. XVI, § 5 (emphasis added).  This provision of the California Constitution "does not mirror or derive from any part of the federal Constitution," Fox v. City of Los Angeles, 22 Cal.3d 792, 801 (1978) (Bird, C.J., concurring), and " 'forbids more than the appropriation or payment of public funds to support sectarian institutions.  It bans any official involvement, *whatever its form*, which has the direct, immediate, and substantial effect of promoting religious purposes.' "  E. Bay Asian Local Dev. Corp. v. State of California, 24 Cal. 4th 693, 721 (2000) (emphasis added) (quoting California Educ. Facilities Auth. v. Priest, 12 Cal. 3d 593, 605 n.12 (1974) (Mosk, J.)).

---

[15] Article XVI, section 5 of the California Constitution reads, in full, as follows:

> Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever; provided, that nothing in this section shall prevent the Legislature granting aid pursuant to Section 3 of Article XVI.

"Given the ordinary meaning of [Article XVI, section 5's] words, the text of the provision has enormous breadth." Paulson v. City of San Diego, 294 F.3d 1124, 1129 (9th Cir. 2002) (en banc).  In Paulson, an en banc panel of the Ninth Circuit "distill[ed] three themes" from relevant California legal precedent construing the No Aid Clause.  294 F.3d at 1130.  First, the Ninth Circuit noted that the No Aid Clause "is so broad that state or local governments *need not* provide a financial benefit or tangible aid in order to violate the provision; they violate it by doing no more than *lending their 'prestige and power' to a 'sectarian purpose.'* " Id. (citation omitted) (emphasis added); see also Hewitt, 940 F.2d at 1571 (the No Aid Clause "admits of no de minimis exception") (citation omitted).

Second, "even a government act that has a secular purpose can violate [the No Aid Clause] if it also has a direct, immediate, and substantial effect of promoting a sectarian purpose." Paulson, 294 F.3d at 1130; see, e.g., Hewitt, 940 F.2d at 1571 (holding that a county park containing religious statues violates the No Aid Clause—despite the county's assertion that the purpose of the park was to promote tourism—because "the California Constitution forbids the County's use of a religious statuary park to achieve a secular goal"); Los Angeles Cnty. v. Hollinger, 221 Cal.App.2d 154, 158 (1963) (holding that publicly financing a film of a religious parade violated the No Aid Clause even though "publicizing the attractions of the county is a proper secular purpose").

Third, a "corollary to the second theme" is that "[g]overnment conduct that aids religious or sectarian purposes, but that does *not* have a direct, immediate, and substantial effect, does not contravene the provision." Paulson, 294 F.3d at 1131. Stated differently, the No Aid Clause "does not prohibit indirect, remote, or incidental benefits that have a primary public purpose." Id. (citation omitted). Pursuant to Paulson, a benefit related to a "primary public purpose" qualifies as "indirect, remote, or incidental"—and thus does not run afoul of the No Aid

Clause—if it is available "on an equal basis" to sectarian and nonsectarian organizations *and* if it "does not have a substantial effect of supporting religious activities."  Id. (citation omitted).

In sum, therefore, the No Aid Clause prohibits the government from:

> (1) granting a benefit in any form (2) to any sectarian purpose (3) regardless of the government's secular purpose (4) unless the benefit is properly characterized as indirect, remote, or incidental.  A sectarian benefit that is ancillary to a primary secular purpose may qualify as "incidental" if the benefit is available on an equal basis to those with sectarian and those with secular objectives.

Id.

### ii.   The Addition of the Cross to the County Seal Grants a Benefit to a Sectarian Purpose, and Thereby Violates the No Aid Clause of the California Constitution

The Latin cross is the "defining and exclusive symbol for the Christian religion" and invokes "the ongoing and exclusive evangelical meaning of the cross for Christians and non-Christians alike."  Siker Decl. at ¶ 6; see also Trunk v. City of San Diego, 629 F.3d 1099, 1110 (9th Cir. 2011) ("We are masters of the obvious, and we know that the crucifix is a Christian symbol.") (quoting Gonzales v. North Township, 4 F.3d 1412, 1418 (7th Cir. 1993)).  For purposes of the Court's No Aid Clause analysis, the threshold question is whether the County's addition of the Latin cross to the seal's depiction of the Mission grants a "benefit" to any "sectarian purpose," irrespective of any purported secular purpose offered by the County.  In light of the "expansive" scope of the foregoing legal standards, the Court concludes that it does.  Paulson, 294 F.3d at 1130.  Specifically, the Court finds that in modifying the 2004 Seal by adding a Latin cross—even if only as a relatively small symbol situated atop an image of the San Gabriel Mission—the County has violated the No Aid Clause of the California Constitution by (1)

1   "devot[ing] [the County's] financial resources" and (2) lending its "power and

2   prestige" to the "sectarian purpose" of adding to its official seal the primary symbol

3   of one religion—Christianity—to the exclusion of others.  Paulson, 294 F.3d at

4   1133.

5        In reaching this conclusion, the Court emphasizes that this case does not

6   simply involve a governmental entity's *continued* use of a longstanding symbol or

7   display containing a Latin cross.  Rather, plaintiffs challenge the County's decision

8   to *add* a cross to a county seal that—unlike its predecessor, the 1957 Seal—has

9   contained no sectarian symbols for nearly a decade.  See Complaint, at ¶ 40

10  (challenging County's attempted "*addition* of the cross to the [2004] Seal")

11  (emphasis added), ¶ 31 (noting that the County's 2014 motion would "*restore* a

12  cross to the County seal . . . .") (emphasis added).  This distinction, and the

13  foregoing history of the depiction of a cross on the County seal, is significant, if not

14  critical, as it informs the Court's assessment of whether a specific "grant" or

15  "appropriation" has been made to further a "sectarian purpose."  Cal. Const. art.

16  XVI, § 5.  The relevant "benefit" here is not merely the *depiction* of a relatively

17  small cross on the seal, but rather the County's *addition* of the cross—and the

18  implementation that will follow—which comes only ten years after the County, at

19  significant expense, replaced the 1957 Seal to avoid, in the apparent view of a

20  majority of the Board at the time, furthering a sectarian purpose.

21       With this distinction and history in mind, the Court also notes that a valid

22  secular purpose behind the County's effort to add the cross to the seal—for

23  example, a desire to reflect a more historically or architecturally accurate depiction

24  of the San Gabriel Mission—does not mandate a different result.  See, e.g.,

25  Hollinger, 221 Cal.App.2d at 158 (No Aid Clause prohibits publicly financing a

26  film of a religious parade even though "publicizing the attractions of the county is a

27  proper secular purpose").  As the Ninth Circuit explained in Paulson, "even a

28

1  government act that has a secular purpose can violate [the No Aid Clause] if it also

2  has a direct, immediate, and substantial effect of promoting a sectarian purpose."

3  Paulson, 294 F.3d at 1130.  This principle is perhaps best illustrated by the

4  California Court of Appeal's decision in Frohliger v. Richardson, 63 Cal. App. 209

5  (Cal. Ct. App. 1923), wherein the court made a "strong statement . . . that the

6  existence of a legitimate secular purpose will not redeem otherwise prohibited

7  governmental aid to religion."  Hewitt, 940 F.2d at 1570 (citing Frohliger with

8  approval).

9       In holding that the use of public funds to restore the San Diego Mission

10  violated the No Aid Clause, the Frohliger court did not challenge the government's

11  proffered secular motivations:

12

13       We concede that the California missions are of historical
14       and educational interest from a cultural and literary
         standpoint, but they approach no such classification as
15       would make them the basis of the state's bounty or the
16       subject of legislative appropriation in the guise of the
         public interest, public good, or public welfare.
17

18                            ***

19       [W]e are in sympathy with the meritorious movement
20       having for its object the restoration and preservation of
         the missions, but no matter how praiseworthy we may
21       believe such efforts to be, we must say that, in our
22       opinion, the state Constitution forbids that such work be
         done at the expense of the taxpayers.  We believe that the
23       act of the Legislature under consideration is in manifest
24       violation of [the No Aid Clause] . . . .

25

26  Frohliger, 63 Cal. App. at 217.  The Frohliger court further reasoned that

27  "[d]isregard[ing] . . . the constitutional bar" of the No Aid Clause by permitting

28  expenditure of public funds to restore the mission "would render the public treasury

easy of access for the levying of tribute, under cover of appropriation acts, by sects of every denomination . . . seeking money for the restoration of old buildings, upon the ground that they were of historical and educational interest, and therefore of public concern." Id.

So, too, would permitting expenditure of the County's time, energy, and resources here for the sole purpose of adding a Latin cross to an otherwise unchanged seal create grounds for "sects of every denomination, and other organizations" to wonder why they are not receiving similar aid from the County. Id. Indeed, there can be little doubt that any modification of the 2004 Seal will necessarily require devotion of substantial County resources. The estimated cost of implementing the 2004 Seal throughout the County—i.e., by replacing the 1957 Seal on County-owned and leased facilities, on decals affixed to County vehicles, and on all stationary and computer applications—was estimated to be $700,000. See Tr. Ex. 26-27; see also Tr. Ex. 24, at 292-93. Comparable financial resources and effort will be devoted to complete the implementation of the 2014 Seal, which, again, contains only one modification from the 2004 Seal: the addition of a Latin cross to the otherwise unaltered image of the San Gabriel Mission that adorned the seal for ten years. See Ramirez Decl. at ¶ 4, Ex. 2; Tr. Ex. 52 (January 7, 2014 Meeting Minutes, Comments of Supervisor Antonovich), at 374-75 (noting that the "phase in" of the 2014 Seal was to be "consistent with the manner in which the [2004 Seal] was phased in following the Board's 2004 redesign"). Of course, "the power, authority, and financial resources" of the County stand behind any such implementation effort, the sole result of which would be the addition of an undeniably sectarian symbol to the County's already-ubiquitous 2004 Seal. Priest, 12 Cal.3d at 604; c.f. Hewitt, 940 F.2d at 1571 (County's ownership and maintenance of religious statues in park aids religion where county "holds the deed to the park and pays for its maintenance").

Irrespective of any appropriation of funds, the Court also concludes that the Board of Supervisors' 2014 motion imparted a benefit to a sectarian purpose by "enlist[ing] the *power and prestige* of the [County] in support of the [addition] of the cross" to the County's preeminent symbol.  Paulson, 294 F.3d at 1133 (emphasis added); Fox, 22 Cal.3d at 806 (Bird, C.J., concurring) ("The ban is on aid to religion in any form"); Johnson v. Huntington Beach Union High Sch. Dist., 68 Cal.App.3d 1, 16 (1977) (upholding school district's rejection of student Bible study club meetings on campus where meetings "implicate[] school authority and prestige behind the dissemination of religious dogma"); Sands v. Morongo Unified Sch. Dist., 53 Cal. 3d 863, 883 (1991) ("[No Aid Clause] prohibits not only material aid to religion, but *any* official involvement that promotes religion.") (emphasis in original).  Despite the County's contention to the contrary, the sectarian benefit afforded by adding the cross to the County seal is hardly comparable to any incidental sectarian benefit afforded by the Los Angeles Unified School District's "instruction on the missions and [use of] textbooks includ[ing] photos of missions with crosses on them," or California's use of social studies and history education guidelines that "specifically direct teaching of the role of missions in the history of California."  Opp'n at 9-10.  Unlike textbooks or educational guidelines, the County's seal is not an educational tool, but a symbolic and representative one, not unlike a flag or a badge.  It carries with it an aura of prestige, authority, and approval.  By singling out the cross for addition to the seal, the County necessarily lends its prestige and approval to a depiction of one faith's sectarian imagery.  The County also provides a platform for broadcasting that imagery on County buildings, vehicles, flags, and stationary.

It is true, of course, that the No Aid Clause "does not prohibit indirect, remote, or incidental benefits [to a sectarian purpose]."  Paulson, 294 F.3d at 1131 (citation omitted); see also Barnes-Wallace v. City of San Diego, 704 F.3d 1067,

1079 (9th Cir. 2012) ("[I]t is important to note that, despite the categorical language of the No Aid Clause, the California Supreme Court [has] . . . re-emphasized that the mere conferring of some benefit on a sectarian organization does not *ipso facto* violate the No Aid Clause."). A benefit "may qualify as 'incidental' if the benefit is available on an equal basis to those with sectarian and those with secular objectives." See Paulson, 294 F.3d at 1131; see also Cal. Statewide Comm. Dev. Authority v. All Persons Interested in Matter of Validity of Purchase Agreement, 40 Cal.4th 788, 801 (2007) (noting that in order to satisfy the No Aid Clause, the government action must be available to "both secular and sectarian institutions on an equal basis").

However, the aid to a sectarian purpose posed here by the addition of the Latin cross is not properly dismissed as merely "incidental." Again, the *only* change to the Seal mandated by the County's 2014 motion—and the *sole* result of the resources that will necessarily be expended in effectuating the motion—is the addition of the Latin cross to the county's official seal. Permitting such a change and the associated expenditure of public funds places the County's power, prestige, and purse behind a single religion, Christianity, without making any such benefit available on an equal basis to those with secular objectives or alternative sectarian views. See Hewitt, 940 F.2d at 1571 (noting that "there may be other [non-Christian] religious groups in [the county] which would appreciate government sponsorship of their religious parks or cemeteries," and for this reason"[t]he California[n] people have written their constitution to guard against" the county's "use of a religious statuary park to achieve a secular goal"); c.f. Barnes-Wallace, 704 F.3d at 1081 (holding that the lease of public land to Boy Scouts was incidental and not in violation of the No Aid Clause where the services the Scouts provided were "essentially neutral to religion" and the equivalent to a "broad curriculum in secular subjects"). Indeed, plaintiffs' testimony regarding their perception of the

2014 Seal as conveying endorsement of Christianity, to the exclusion of other religious and non-religious beliefs, undermines the County's claim that the benefit to Christianity is incidental.[16]  See Hewitt, 940 F.2d at 1571 (noting that "[e]ach plaintiff was surprised and disturbed by the apparent endorsement the County was giving to the religious message of [the] statues" and that such "testimony at trial *undermines any argument that the government support to religion here is only incidental*") (emphasis added).

The County resists these conclusions on various grounds, none of which are availing.  Specifically, the County argues that missions have played a central role in the history of California and Los Angeles County, as "reflected in the core curriculum of California schools," where "[m]ission history is taught as a secular subject, and routine depiction[s] of missions with crosses are found in a secular context." Id. at 8, 10.  At bottom, the County's central argument is that "no reasonable observer—no resident of California, and in particular in the Los Angeles area—would view a depiction of the San Gabriel Mission with a cross as one part of the County Seal . . . as indicating some approval of, or providing a benefit to, a particular religion." Opp'n at 12.  This argument fails for multiple reasons.

First, the relevant government act here is not merely the "depiction of the San Gabriel Mission with a cross as one part of the County Seal," but rather the

---

[16] See, e.g., Little Decl. at ¶ 4 (objecting to "the Board's decision to alter the County seal solely to add a cross to it while excluding the symbols of any of the other faiths practiced by citizens of Los Angeles"); Rosove Decl. at ¶¶ 4-5 (opposing the addition of the cross "with every fiber of [his] being" and expressing his belief that adding the cross "alienates all faith and non-faith based religions and communities"); Laarman Decl. at ¶¶ 4-10 (stating that he is "offended as a Christian minister and theologian" by the addition of the cross to the 2004 Seal which is "blatantly exclusionary"); Myers Decl. at ¶¶ 7-12 (objecting to the addition of the cross because it is a "symbol of violence, discrimination, and group hatred" against non-Christian communities); Syed Decl. at ¶¶ 4-6 (objecting to "the Board's decision to impose . . . the cross, upon [him] and more than half a million fellow Muslims in Los Angeles"); and Bernstein Decl. at ¶ 4 (stating that she is "insulted by the Board's decision to add a cross to the County seal" because the cross symbolizes "the oppression and violent persecution of [her] entire faith" and "the seal does not include symbols representing Judaism").

County's specific effort to *add* a Latin cross, at significant expense, to an otherwise unchanged version of the seal.  Second, the County mistakenly argues that recent decisions purportedly "addressing application of the No-Aid Clause concerning governmental use or depiction of religious material[] employ analysis virtually identical to that used in analyzing federal constitutional claims, namely whether a *reasonable observer* would perceive the government conduct as providing a benefit to religion."  Opp'n at 4 (emphasis added); see also id. at 4-8.  In actuality, as plaintiffs rightly note, none of the cases upon which the County relies apply a "reasonable observer" standard *in analyzing the No Aid Clause* of the California Constitution.  See Sedlock v. Baird, 235 Cal.App.4th 874, 889, 889 n.30 (2015) (holding that the teaching of yoga poses did not violate California's *Establishment Clause* and declining to analyze California's No Aid Clause because the Sedlock plaintiffs—unlike those in the instant action—"provide[d] no independent arguments in support of [their No Aid Clause] claim[]"); Barnes-Wallace, 704 F.3d at 1083-84 (9th Cir. 2012) (employing a "reasonable observer" standard only in applying the Lemon test and only after the Court had already concluded its No Aid Clause analysis); Brown v. Woodland Joint Unified Sch. Dist., 27 F.3d 1373, 1378 (9th Cir. 1994) (applying the "reasonable observer" standard to determine whether inclusion of witches and sorcerers as characters in a series of reading textbooks violated the "effects" prong of the Lemon test).  Thus, the Court is not bound by any such "reasonable observer" standard in its analysis of the No Aid Clause, and therefore does not employ any such analysis here.

In sum, the Court finds that in seeking to expend substantial resources to *add* a depiction of a undeniably religious symbol to an otherwise unchanged version of the 2004 Seal, the County has singled out and conferred the government's prestige upon the Christian religion, as in Frohliger, 63 Cal. App. at 217 (No Aid Clause prohibits use of public funds to restore the San Diego Mission despite "historical

and educational interest [in California missions] from a cultural and literary standpoint"), Hewitt, 940 F.2d at 1571 (county's ownership and maintenance of religious statues in a park was "direct" and substantial), Hollinger, 221 Cal.App.2d at 158 (public financing of a film of a religious parade violates the No Aid Clause), and Paulson, 294 F.3d at 1132 (the city "directly, immediately, and substantially aided the sectarian purpose of preserving the cross"), among others.[17]  The Court therefore concludes that adding the cross to the 2004 Seal directly benefits Christianity in violation of the California Constitution's No Aid Clause, the state's "definitive statement of the principle of government impartiality in the field of religion."  Priest, 12 Cal.3d at 604 (citation omitted).

In reaching its conclusion, the Court rejects the County's implication that such a finding effectively means that the No Aid Clause is "so broad that it requires *expungement* of the depiction of any religious image on public property without regard to the context in which it is displayed and the manner in which it is

---

[17] In advancing their argument regarding the No Aid Clause, plaintiffs also rely upon Fox v. City of Los Angeles, 22 Cal.3d 792, 801 (1978).  In Fox, the California Supreme Court held that a large illuminated display of a Latin cross on Los Angeles City Hall violated the California Constitution, despite the city's contention that the display "constituted no more than 'participation in the secular aspects of the Christmas and Easter holidays.' "  Id. at 798.  In its majority opinion, the Supreme Court in Fox did not specify which of California's various constitutional provisions the display violated, discussing the relevant provisions of the California Constitution in general terms and without reference to the No Aid Clause:

> The California Constitution, like the United States Constitution, does not merely proscribe an establishment of religion.  Rather, all laws "*respecting* an establishment of religion" are forbidden. (Italics added.)  The California Constitution also guarantees that religion shall be freely exercised and enjoyed "without discrimination or preference."  Preference thus is forbidden even when there is no discrimination.  The current interpretations of the United States Constitution may not be that comprehensive.

Fox, 22 Cal. 3d at 796 (alteration in original).  However, because the Fox majority did not expressly rely upon the No Aid Clause in its analysis, the Court does not rely upon Fox in reaching its conclusion here regarding the application of the No Aid Clause as to this case.

perceived by a reasonable observer." Opp'n at 5. No such "expungement" is at issue here, where the relevant governmental act is the County's attempt to devote substantial resources towards an effort whose lone goal is the *addition* of a religious symbol to the County's otherwise secular official emblem.

### c.   The No Preference Clause of the California Constitution

Plaintiffs also contend that the addition of the Latin cross to the County Seal violates the "No Preference Clause" of article I, section 4 of the California Constitution, which guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference."[18] Cal. Const. art. I, § 4. The Ninth Circuit has stated in dicta that the No Preference Clause "has been interpreted by California state courts as being broader than the Establishment Clause of the First Amendment." Vernon, 27 F.3d at 1395 (citing Okrand v. City of Los Angeles, 207 Cal.App.3d 566, 571 (1989) ("California's constitutional provisions are more comprehensive than those of the federal Constitution.") (citations omitted); Fox, 22 Cal.3d at 796 ("Preference thus is forbidden even when there is no discrimination. The current interpretations of the United States Constitution may not be that comprehensive.")). Citing to article I, section 4 of the California Constitution, the Ninth Circuit has previously distilled several factors relevant to determining whether, "when viewed in its historical and physical context, a given [religious] display on public property" violates the California Constitution:

> [1] the religious significance of the display, [2] the size and visibility of the display, [3] the inclusion of other religious symbols, [4] the historical background of the

---

[18] Article I, section 4 of the California Constitution reads, in full, as follows:

> Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion. A person is not incompetent to be a witness or juror because of his or her opinions on religious beliefs.

1    display, and [5] the proximity of the display to
2    government buildings or religious facilities.

3

4  Ellis, 990 F.2d at 1525 (holding that San Diego's ownership of the Mount Helix

5  Cross, a 36-foot Latin cross in a public park, and the Mount Soledad Cross, a 43-

6  foot Latin cross in a public park, violated California's No Preference Clause).

7  Although the court in Ellis employed the five factors above in finding violation of

8  the No Preference Clause, the factors "are simply a convenient list to guide a

9  court's analysis; they do not form a definitive test utilized by the California courts."

10  Carpenter, 93 F.3d at 630 (finding that "all but one of the five Ellis factors counsel

11  that the Mount Davidson Cross violates the No Preference Clause" and that

12  "[b]ecause we hold that the Cross violates the No Preference Clause, we need not

13  reach [plaintiff's] other claims under the California Constitution or the United

14  States Constitution").  Nonetheless, plaintiffs encourage the Court to employ the

15  Ellis factors and thereby find the County's addition of the cross as violative of the

16  No Preference Clause.

17         The Court declines to do so, in light of a more recent California Supreme

18  Court decision that casts doubt on the proposition that the No Preference Clause

19  affords broader protection than the U.S. Constitution's Establishment Clause:

20

21            This court has never had occasion to definitively construe
22            the no preference clause of article I, section 4 and we
              need not do so here.  In guaranteeing free exercise of
23            religion "without discrimination or preference," the plain
              language of the clause suggests, however, that the intent
24            is to ensure that free exercise of religion is guaranteed
              regardless of the nature of the religious belief professed,
25            and that the state neither favors nor discriminates against
              religion.  Having concluded above that an exemption
26            from a landmark preservation law satisfies all prongs of
27            the Lemon test, it follows that the exemption is neither a

28

governmental preference for or discrimination against religion.

E. Bay Asian Local Dev. Corp. v. State of California, 24 Cal. 4th 693, 719 (2000) ("East Bay").  Indeed, the Ninth Circuit has recently construed the California Supreme Court's decision in East Bay to "h[o]ld that a governmental action that satisfies the [Lemon] test . . . necessarily passes muster under the California No Preference Clause."  Barnes-Wallace, 704 F.3d at 1082 ("Accordingly, we need not separately analyze the plaintiffs' claims under these state constitutional provisions because our disposition of this case requires us to address the plaintiffs' federal Establishment Clause claims."); see also Am. Humanist, 2014 WL 791800, at *6 ("[B]ecause the California Supreme Court in East Bay found the Lemon test to also govern the analysis under California's Establishment and No Preference Clauses, this Court applies the Lemon test to both the state and federal constitutional issues in question in the instant case.").  Therefore, for purposes of the instant motion, the Court treats the protections of article I, section 4's No Preference Clause as coterminous with those of the U.S. Constitution's Establishment Clause, such that application of the Lemon test, discussed infra, decides plaintiffs' claim under both California's No Preference Clause and the First Amendment.

### d.    The Federal Establishment Clause

The Federal Establishment Clause prohibits the government from making any law "respecting an establishment of religion" or undertaking any act that unduly favors one religion over another.  U.S. Const. amend. I.   The test articulated by the Supreme Court in Lemon v. Kurtzman "remains the Court's principal framework for applying the Establishment Clause," although Lemon has been "much criticized both inside and outside the Court," and "sometimes ignored by the Court altogether."  Santa Monica Nativity Scenes Comm. v. City of Santa Monica, 784 F.3d 1286, 1299 n.7 (9th Cir. 2015) (citing Lemon v. Kurtzman, 403 U.S. 602,

612 (1971)).  Under the <u>Lemon</u> test, a government action violates the Establishment Clause if (1) it lacks a "secular legislative purpose," (2) "its principal or primary effect" is to "advance[ or] inhibit[ ] religion," or (3) it "foster[s] an excessive government entanglement with religion."  <u>Lemon</u>, 403 U.S. at 612-13 (internal quotation marks omitted).  As explained in the discussion below, the Court concludes that the County's addition of the Latin cross to the 2004 Seal violates both the "purpose" and "effect" prongs of the <u>Lemon</u> test.

**i.**     **<u>Lemon</u> Test Prong 1: Sectarian or Secular Purpose**

***1.***     ***The Court Assesses the Board's Purpose from the Vantage Point of an Objective Observer Familiar with what History has to Show***

Under <u>Lemon</u>'s "purpose" inquiry, the Court assesses the underlying purpose of the government action from the vantage point of "an 'objective observer' " who is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show."  <u>McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.</u>, 545 U.S. 844, 862, 866 (2005) (quoting <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 308 (2000)).  In assessing purpose, the Court may "take[] account of the traditional external signs that show up in the ' "text, legislative history, and implementation of the statute," ' or comparable official act." <u>Id.</u> at 862 (citation omitted); <u>see also</u> <u>Edwards v. Aguillard</u>, 482 U.S. 578, 594-95 (1987) (noting that the Court's inquiry looks to the "plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history [and] the historical context of the statute, . . . and the specific sequence of events leading to [its] passage").

Crucially, "although a [legislative body's] stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective."  <u>McCreary</u>, 545 U.S. at 864 (citing

33.

Santa Fe, 530 U.S. at 308 ("When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference.  But it is nonetheless the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one.' ")).  Plaintiffs accordingly argue that when viewed in light of the seal's broader history, the Board of Supervisors' stated purpose for adding the Latin cross to the 2004 Seal—i.e., for purposes of cultural, historical, architectural, and aesthetic accuracy—is not genuine.  Motion at 26.  For reasons explained more fully below, the Court concludes that a reasonable, objective observer, familiar with what history has to show, would conclude that a predominantly sectarian purpose informed the County's decision to add the cross to the seal, such that the County's addition of the cross fails to satisfy the first prong of the Lemon test.

The touchstone of the Court's analysis is the Supreme Court's 2005 decision in McCreary, wherein the Court assessed the decisions of two Kentucky counties to erect large, framed copies of the Ten Commandments in their respective courthouses.[19]  In one of the counties, the display was set up in a ceremony presided over by the county Judge-Executive, who called the Commandments "good rules to live by" and further recounted the story of an astronaut who became convinced "there must be a divine God" after viewing the Earth from the moon.   McCreary, 545 U.S. at 851.  A pastor who had accompanied the Judge-Executive later told the press that displaying the Commandments was "one of the greatest things the judge could have done to close out the millennium."  Id.  The erection of the displays prompted a lawsuit by the ACLU, but before the district court reached the ACLU's request for a preliminary injunction, the legislative bodies of each county authorized a second, expanded display.  Id. at 851.  The resolutions enacting this

---

[19] As the Ninth Circuit has noted, "[t]here can be little doubt after McCreary not only that Lemon is still alive but that the secular purpose inquiry has been fortified."  Card v. City of Everett, 520 F.3d 1009, 1017 (9th Cir. 2008) (citing McCreary, 545 U.S. at 900-03 (Scalia, J., dissenting)).

second display stated that the Ten Commandments are "the precedent legal code upon which the civil and criminal codes of . . . Kentucky are founded," and that the "Founding Father[s] [had an] explicit understanding of the duty of elected officials to publicly acknowledge God as the source of America's strength and direction." Id. at 852-53.  In addition to the Ten Commandments, the second resolution called for the display of eight other documents in smaller frames, each having either a religious theme or excerpted to highlight a religious element.  Id.  at 853-54.

The district court entered a preliminary injunction after finding that the displays failed to satisfy Lemon's "secular purpose" prong.  Id. at 854.  Following the court's ruling, the counties erected a third display in the courthouses, albeit without repealing their previous resolutions or passing a new one.  Id. at 855.  This third iteration, entitled, "The Foundations of American Law and Government Display," included the following nine framed documents, each accompanied by a statement about its historical and legal significance: the Ten Commandments, the Magna Carta, the Declaration of Independence, the Bill of Rights, the lyrics of the Star Spangled Banner, the Mayflower Compact, the National Motto, the Preamble to the Kentucky Constitution, and a picture of Lady Justice.  Id. at 855-56.  The counties offered several explanations for the new version, including desires to (1) "demonstrate that the Ten Commandments were part of the foundation of American Law and Government," and to (2) "educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government."  Id. at 856-57.

The Supreme Court rejected these statements of purpose as a "litigating position," finding that "[n]o reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays."  Id. at 871-72 (noting that "although repeal of the earlier county authorizations would not have erased them from the record of evidence bearing on current purpose, the

extraordinary resolutions for the second displays passed just months earlier were not repealed or otherwise repudiated"). The counties' newfound statements of purpose were further belied by the display itself, which—despite purporting to include documents "foundational" to American government—"odd[ly]" omitted both the original Constitution of 1787 as well as the Fourteenth Amendment. Id. at 872. The reasonable observer would be further "puzzled" by the display's posted claim that the Ten Commandments' influence was "clearly seen" in the Declaration of Independence, despite the Declaration itself holding that the government's authority to enforce the law derives "from the consent of the governed," unlike the Commandments' "divine imperatives." Id. at 872-73. Ultimately, the Court observed, "[i]f the observer had not thrown up his hands, he would probably suspect that the Counties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality." Id. at 873.

In assessing purpose in the instant case, as in McCreary, "reasonable observers have reasonable memories, and [Supreme Court] precedent[] sensibly forbid[s] an observer 'to turn a blind eye to the context in which [the challenged governmental] policy arose.' " Id. at 866 (citation omitted). The relevant "context" in this case includes the County's inclusion of an unadorned cross on the 1957 Seal for nearly fifty years, as well as the Board's divided vote to remove the cross and adopt a modified seal in 2004. To the extent the County argues otherwise, it asks the Court "to ignore perfectly probative evidence" and appears to "want an absentminded objective observer, not one presumed to be familiar with the history of the government's actions and competent to learn what history has to show" Id. Plainly, such a position "just bucks common sense."[20] Id.

---

[20]In a separately-filed motion to strike, defendants seek to exclude much of the evidence plaintiffs proffer in support of their arguments under Lemon's first prong. Dkt. 119 ("Mot. to Strike"). Specifically, defendants seek to exclude evidence that generally falls into one of three categories:

(1) non-public emails and letters, sent by members of the public to individual members of the Board of Supervisors or County employees, expressing support or disapproval of the 1957 Seal, the 2004 Seal, or the 2014 Seal, see, e.g., Tr. Exs. 10-11, 14-23, 37, 40-41, 44-47, 50-51, 54-56; (2) internal emails and memos between County employees regarding the various versions of the seal, including documents purportedly evidencing continued use of the 1957 Seal following its 2004 revision, see, e.g., Tr. Exs. 28-34, 85-87, as well as memos and emails regarding implementation of the 2014 seal, see, e.g., Tr. Exs. 26, 67-69, 83; and (3) various emails that were sent by individual Supervisors and that reference the 2014 Seal, see, e.g., Tr. Exs. 38-39, 42, 48-49, and 51.

The County contends that McCreary limited the scope of information relevant under Lemon's purpose prong, such that much of plaintiffs' proffered evidence is irrelevant and therefore inadmissible pursuant to Federal Rules of Evidence 401 and 402. Specifically, the County notes that "[t]he eyes that look to purpose belong to an 'objective observer,' " and in determining the government's purpose, the Court must not conduct "any judicial psychoanalysis of a drafter's heart of hearts." McCreary, 545 U.S. at 862. The County rightly notes that McCreary does not reference non-public communications to governmental actors, correspondence between governmental employees, or statements made by governmental actors in a non-public setting— that is, McCreary does not rely upon evidence of purpose uncovered through pretrial discovery, but rather upon the "traditional external signs that show up in the text, legislative history, and implementation of the . . . official act." Id. (internal quotation marks omitted). Because plaintiffs' evidence was not publicized or otherwise known to McCreary's "objective observer," the County argues that such evidence is irrelevant and inadmissible to the federal Establishment Clause inquiry. The County further asserts that because the challenged evidence is non-public and has not been produced for public viewing, it is also irrelevant to the No Aid Clause inquiry, as it has "no bearing on the *effect* of 2014 Seal on religious institutions." Mot. to Strike at 7.

Plaintiffs, however, take a much broader view of relevance under McCreary. Specifically, plaintiffs argue that the challenged evidence, including non-public emails and memos, are relevant to McCreary's "objective observer" test, as the evidence is part of the complete "history of the [County's] actions" that the Court is entitled to examine in assessing purpose. Opp'n to Mot. to Strike at 3 (citing McCreary, 545 U.S. at 866) (explaining that the purpose inquiry is viewed through the eyes of an "objective observer" who is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show"). First, plaintiffs argue that evidence indicating continued use of the 1957 Seal following the 2004 amendment "is an important part of the sequence of events in this lawsuit" that "can be observed objectively, i.e., without inquiring into the Supervisors' subjective thoughts or 'heart of hearts,' see McCreary, 545 U.S. at 862," and that such evidence is relevant and admissible to the Court's Establishment Clause analysis. Opp'n to Mot. to Strike at 4. Second, plaintiffs contend that certain emails sent by individual Supervisors—particularly, Supervisor Antonovich—are relevant to discerning the purpose behind the Board's 2014 amendment. Id. at 6-8. Third, plaintiffs argue that private email communications and correspondences sent by members of the public to the Supervisors are probative of how the general public, and the "objective observer," actually perceived purpose and effect of 2014 amendment. Id. at 9-11. Finally, plaintiffs argue that some of the challenged evidence is relevant to the No Aid Clause inquiry, which does not look to McCreary's "objective observer" standard at all. Id. at 3.

### 2. *A Reasonable, Objective Observer Would Find a Sectarian Purpose Behind the County's Addition of the Cross*

In the instant case, the stated purpose behind the Board's 2014 amendment to the seal is "to make the County seal artistically, aesthetically and architecturally correct by placing the cross on top of the San Gabriel Mission in order to accurately reflect the cultural and historical role that the Mission played in the development of the Los Angeles County region." See Tr. Ex. 36. "While the Court is normally deferential to a [County's] articulation of a secular purpose," Edwards, 482 U.S. at 586-87, the County's stated purpose must be "genuine . . . and not merely secondary to a religious objective," as assessed through "[t]he eyes . . . [of] an ' "objective observer" ' " who is "familiar with the history of the government's actions and competent to learn what history has to show," McCreary, 545 U.S. at 862, 864, 865 (citations omitted). Stated differently, because "the world is not made brand new every morning," an objective observer cannot infer the Board's purpose "only from the latest news about the last in a series of governmental actions." Id. at 865. That is, an objective observer assessing the Board's purpose could not ignore the County's nearly fifty-year long depiction of an unadorned cross on its seal prior to the 2004 revisions, nor could such an observer fail to recognize the Board's 2004 decision to remove the Latin cross following a series of

---

Having carefully considered the parties' arguments, the Court concludes that plaintiffs take an overly broad view of relevance and admissibility under McCreary. Nonetheless, the Court declines the County's invitation to strike broad swaths of evidence on the grounds that such evidence is irrelevant under the inquiry that McCreary requires. To the extent the Court relies upon any of plaintiffs' challenged evidence, the Court addresses the County's substantive objections on an individualized basis. Accordingly, the County's Motion to Strike is **DENIED**. Defendants' supplemental motions to exclude additional evidence, see dkts. 153, 154, 155, are similarly **DENIED AS MOOT**, as the Court does not rely upon this evidence in reaching its conclusion here.

contentious public hearings wherein, as one Supervisor put it at the time, the public's vocal objection "was clearly . . . a religious one."  Tr. Ex. 13, at 209.  In light of these considerations, the Court finds that the Board's stated goal of achieving artistic, architectural, cultural, and historical accuracy is inconsistent with how a reasonable, objective observer, familiar with what history has to show, would construe the Board's decision to reintroduce a cross to the seal.

First, a reasonable, objective observer would find it "odd[]" that the Board's purported concern with the seal's artistic, aesthetic, and architectural accuracy appears limited to the depiction of the Mission—specifically, to its inclusion of the cross, the preeminent symbol of Christianity.  <u>McCreary</u>, 545 U.S. at 872.  If substantial funds are again to be spent modifying the seal and thereby "accurately reflect[ing] the cultural and historical role that the Mission played in the development of the Los Angeles County region," an objective observer would necessarily wonder why the Board did not do the same for the seal's other significant historical depictions, such as the *San Salvador*, the cow Pearlette, or the Hollywood Bowl.  A likely answer, as the County itself suggests, is that the seal "is not intended to be an exact diagram of anything," as all of its "elements . . . are by necessity somewhat stylized."  Opp'n at 24.  And even though, as the County argues, "a stylized representation has to make clear to an observer what is actually being depicted," an objective observer would find the 2004 Seal's depiction of the Mission no less clear than its highly-stylized and inaccurate depiction of the Hollywood Bowl, currently represented by a two-dimensional series of concentric half-circles.  In short, a reasonable, objective observer would find that the County's stated purpose behind adding the cross—i.e., achieving "cultural and historical" accuracy by "mak[ing] the . . . seal artistically, aesthetically and architecturally correct"—is inconsistent with the County's apparent willingness to tolerate inaccurate depictions of other aspects of the seal's imagery.

Second, numerous courts have suggested that governmental use of religious symbols where nonreligious imagery would have sufficed generally evinces a religious purpose.  See,e.g., ACLU v. Rabun Cnty. Chamber of Commerce, Inc., 698 F.2d 1098, 1111 (11th Cir. 1983) (holding war memorial cross unconstitutional "even if . . . the purpose for constructing the cross was to promote tourism" because "a government may not 'employ religious means to reach a secular goal unless secular means are wholly unavailing' ") (quoting Sch. Dist. of Abington Twp., Pa. v. Schempp, 374 U.S. 203, 294 (1963) (Brennan, J., concurring)); Am. Humanist, 2014 WL 791800, at *8 ("Although the cross serves as a tombstone, a religious symbol is not necessary to mark a grave, and . . . the use of a religious symbol where one is not necessary evidences a religious purpose."); Greater Houston Chapter of ACLU v. Eckels, 589 F. Supp. 222, 234 (S.D. Tex. 1984) (finding religious purpose behind a city's use of a cross and a Star of David in war memorial statues where the memorial could have honored veterans without using religious symbolism); Mendelson v. City of St. Cloud, 719 F. Supp. 1065, 1070 (M.D. Fla. 1989) (rejecting contention that a lighted cross monument had "secular and historical value as a guidepost for fisherman and pilots as a landmark" because "[s]ecular means are availing here").

Although the County argues that the seal was "revised for the proper secular purpose of accurately depicting a historic landmark in a matter that makes it readily identifiable," Opp'n at 8, Dietler Decl. at ¶ 28, Hackel Decl. at ¶¶ 31-32, 35, the Court rejects the notion that the seal must include a cross in order to "readily" identify or "accurately depict" the San Gabriel Mission.  It is true, as one of the County's experts testified, that a cross stood atop the eastern façade of the Mission for nearly one hundred years, from approximately 1889 through 1987, when the cross was removed following the Whittier earthquake.  Hackel Decl. at ¶ 36; see also id. at Ex. 2 (containing thirty-five images, dated 1889 through 1973, depicting

40.

a cross atop the Mission's eastern façade).  However, the record also indicates that for nearly the same amount of time, throughout most of the nineteenth century, no cross adorned this portion of the structure.  See Hackel Decl. at ¶¶ 66-70, Exs. 2-6 (painting, ca. 1832-1835), 2-8 (sketch, ca. 1856), 2-9 (photo, ca. 1877), 2-10 (photo, ca. 1877), 2-11 (photo, ca. 1880), 2-12 (photo, ca. 1885), 2-14 (photo, ca. 1877-1880), 2-18 (photo, ca. 1887-1888).

More importantly, the County has cited no evidence of confusion on the part of the public regarding the 2004 Seal's imagery, which for a decade depicted the Mission's eastern façade without a cross.  See Hackel Decl. at ¶ 35.  Indeed, one of the County's own experts notes that the San Gabriel Mission's eastern façade is "the original entryway of the oldest, largest and *most distinctive* surviving building associated with the mission."  Dietler Decl. at ¶ 28 (emphasis added); see also Hackel Decl. at ¶ 72 (noting "original front of the [M]ission" was its eastern façade).  Its distinctive architectural features contribute to a "fort"-like appearance that, in the opinion of the County's expert, architecturally distinguishes the San Gabriel Mission from all other California missions.  Hackel Decl. at ¶ 35.  The Court is not convinced that an objective observer would struggle to recognize the Mission's "oldest, largest and most distinctive surviving building" unless the depiction of the structure is also adorned by a cross.[21]  See Dietler Decl. at ¶ 28.

Third, additional consideration of "what history has to show"—including "traditional external signs" that show up in the "text, legislative history, and implementation of the [County's official use of the seal]"—would cast further doubt, in the eyes of a reasonable, objective observer, regarding the County's proffered secular purpose for adding the cross.  McCreary, 545 U.S. at 866 (citation and quotation marks omitted).  The County's 1957 Seal included an image of an

---

[21] Despite the Mission's distinctive features, the County, in its opposition to the instant motion, argues that the 2004 Seal depicts the Mission "simply . . . as a large building without conveying its historical significance."  Opp'n at 21.

unadorned Latin cross in the sky, flanked by two stars, above an image of the Hollywood Bowl.  Tr. Ex. 7.  In 2004, following widely publicized and contentious public meetings, the Board voted 3-2 to remove the Latin cross and to add the Mission, unadorned by a cross.  Tr. Ex. 24, at 309-10.  This vote was publicly presented as a compromise meant to remove all sectarian imagery on the seal and thereby avert a constitutional challenge to it.  See Vasquez, 487 F.3d at 1257 (finding the Board's removal of the cross from the 1957 Seal to be "viewed as an effort to restore their neutrality and to ensure their continued compliance with the Establishment Clause").

A reasonable, objective observer aware of this contentious history would likely view the County's recent decision to reintroduce a cross at substantial expense as motivated by a sectarian purpose, despite the County's appeal to considerations of artistic and historical accuracy.[22]  As the Ninth Circuit has noted, "[t]he argument that a cross has a historic connection cannot, of course, be treated as 'an argument which [can] always "trump" the Establishment Clause[ ] because of the undeniable significance of religion and religious symbols in the history of many [American] communities.' "  Trunk, 629 F.3d at 1111 n.11 (citation omitted) (alterations in original); see also Harris v. City of Zion, 927 F.2d 1401, 1413-15 (7th Cir. 1991) (finding City Council's 1986 vote "to retain the [cross on its] seal for historical reasons" to be a "perfunctory appeal to history," noting that even a city with "a unique history . . . may not honor its history by retaining [a] blatantly sectarian seal, emblem, and logo"); Mendelson, 719 F. Supp. at 1070 (finding no

---

[22] The Court notes, however, that its holding does not stand for the proposition that a historically accurate depiction of a Latin cross atop a mission on a county seal or other public display is *per se* impermissible.  Nor does the Court's finding imply that an adoption of such a display necessarily stems from an impermissible sectarian purpose.  As the Supreme Court noted in McCreary, "[o]ne consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage."  Id. at 866 n.14.  This possibility "presents no incongruity, however, because purpose matters."  Id.

secular purpose behind the display of a cross on a water tower despite defendants'

contention  that the cross had "historical value as a guidepost for fishermen and

pilots and as a landmark").

Accordingly, the Court concludes that the County's addition of the cross to

the 2004 Seal violates <u>Lemon</u>'s first prong.[23]  Rather than finding a concern for

artistic or historical accuracy behind the County's addition of the cross, an objective

observer, familiar with the seal's history, "would probably suspect that the

Count[y] w[as] simply reaching for any way to keep a religious [symbol] on [an

emblem] . . . constitutionally required to [display] religious neutrality."  <u>McCreary</u>,

545 U.S. at 873.

/ / /

---

[23] The County argues that this case is controlled by <u>Newdow v. Rio Linda Union Sch. Dist.</u>,
wherein the Ninth Circuit found a state statute and school district policy calling for voluntary
recitation of the Pledge of Allegiance, including the phrase, "one Nation under God," to be
constitutional.  597 F.3d 1007, 1012 (9th Cir. 2010).  The Court in the instant case reads <u>Newdow</u>
to stand primarily for two propositions, both of which are consistent with the Court's analysis and
findings here.  First, the <u>Newdow</u> court made clear that religious motivations or statements of
individual members of the public cannot, standing alone, themselves defeat a governmental action
that is otherwise based on a plausible, predominantly secular purpose.  <u>Id.</u> at 1033-34 ("[The]
dissent errs . . . in focusing solely on what individuals say when they are making political
statements to their constituencies and ending its analysis there . . . [Doing so would] grant[] a
heckler's veto to anyone who ma[kes] just enough noise in support of an enactment so as to
defeat an otherwise valid measure") (emphasis in original).  Here, the Court has not inferred the
Board's purpose from statements or documents bearing upon the views expressed by individual
members of the public.  Rather, the Court has focused on how a reasonable, objective observer
would perceive the Board's 2014 motion to change the seal, and the purpose for the change
expressly stated by the County—namely, achieving artistic, aesthetic, architectural, cultural, and
historical accuracy.  Again, as stated <u>supra</u>, the Court has found this stated purpose to be
inconsistent with how a reasonable, objective observer would construe the County's decision to
add a cross to the seal.  Second, while under <u>Newdow</u> the purpose inquiry must focus on "the
contemporaneous legislative history" of the challenged governmental act—in this case, the 2014
addition of the cross—<u>Newdow</u> also made clear that courts "must examine the relevant history"
under the "holistic approach" of <u>Wallace v. Jaffree</u>, 472 U.S. 38 (1985).  <u>See Newdow</u>, 597 F.3d
at 1019, 1028 (citing <u>Wallace</u>, 472 U.S. at 58 (finding an impermissible, sectarian purpose behind
a statute calling for a moment of silence "for meditation or voluntary prayer" based in part upon
the "character" of a "sequel" statute, passed a year later, authorizing teachers to lead "willing
students" in a prescribed prayer)).  Here, the Court has examined that history in conducting its
analysis.

ii.     **Lemon** Test Prongs 2 and 3: Effect of Advancing
Religion

1.     *The Court Assesses the Effect of Adding the Cross
to the Seal from the Vantage Point of an Objective
Observer Familiar with what History has to Show*

Under <u>Lemon</u>'s second prong, a "[g]overnmental act[] has the primary effect
of advancing or disapproving of religion if it is 'sufficiently likely to be perceived
by adherents of the controlling denominations as an endorsement, and by the
nonadherents as a disapproval, of their individual religious choices.' " <u>Vasquez</u>,
487 F.3d at 1256 (citation omitted); <u>see also</u> <u>Lynch v. Donnelly</u>, 465 U.S. 668, 690
(1984) (O'Connor, J., concurring) ("The effect prong asks whether, irrespective of
government's actual purpose, the practice under review in fact conveys a message
of endorsement or disapproval.").  Under the <u>Lemon</u> test's third prong, a
government action must not "foster[] an excessive government entanglement with
religion." <u>Santa Monica Nativity Scenes Comm</u>, 784 F.3d at 1299 (citation
omitted).  While plaintiffs treat these two prongs separately in their motion, "the
Supreme Court essentially has collapsed the[] last two prongs to ask whether the
challenged governmental practice has the effect of endorsing religion." <u>Trunk</u>, 629
F.3d at 1106 (internal quotation marks and citation omitted); <u>see also</u> <u>id.</u> at 1109
(defining "endorsement" as "those acts that send the stigmatic message to
nonadherents 'that they are outsiders, not full members of the political community,
and an accompanying message to adherents that they are insiders, favored
members' ") (citation omitted).

Again, the challenged governmental action in this suit is the County's 2014
motion to add a Latin cross to the 2004 Seal.  As with the inquiry regarding the
County's *purpose* in doing so, the Court "conduct[s] [its] inquiry [regarding the
*effect* of the County's action] from the perspective of an 'informed and reasonable'

observer who is 'familiar with the history of the government practice at issue.' " Id.
at 1110 (citation omitted).  In Vasquez, for example, the Ninth Circuit assessed the
constitutionality of the County's "removal of the cross from the [1957] LA County
Seal" from the perspective of "a 'reasonable observer' familiar with the history and
controversy surrounding the use of crosses on municipal seals."  487 F.3d at 1257
(citing Murray v. City of Austin, 947 F.2d 147, 163 (5th Cir. 1991) (Goldberg, J.,
dissenting) (noting that there has been "constant . . . judicial disapproval of
government use of Christian crosses . . . on municipal seals" and "[t]he Supreme
Court itself has repeatedly disapproved in dicta the governmental display of
crosses")).  Applying the relevant standard here, the Court finds that an informed
and reasonable observer familiar with the history surrounding the County's use of a
Latin cross on its seal—and the County's controversial removal of the cross in
2004—would find its recent effort to reintroduce a cross to the seal as favoring one
set of religious beliefs over another.

     The Court relies, in large part, on Trunk, wherein the Ninth Circuit found that
the Latin cross and veterans' war memorial atop Mount Soledad in La Jolla,
California violated the Establishment Clause.  629 F.3d at 1101-02.  The particular
display that plaintiffs challenged in Trunk was "the third in a line of Latin crosses"
that had stood on Mount Soledad since 1913.  Id. at 1119.  Accordingly, in
considering the propriety of the most recent display under Lemon's second prong,
the Ninth Circuit assessed whether "the entirety" of the memorial, "*when
understood against the background of its particular history and setting*, project[ed]
a government endorsement of Christianity."  Id. at 1118 (emphasis added); accord
Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995)
(O'Connor, J., concurring) ("[T]he reasonable observer in the endorsement inquiry
must be deemed aware of the history and context of the community and forum in
which the religious display appears.").  Ultimately, despite evidence in the record of

some secular usage of the memorial site, the court concluded that, on balance, "[h]istory would lead the reasonable observer to perceive a religious message in the [m]emorial." Id. at 1118-19.

In finding a sectarian effect to the government's display of the cross, the Trunk court cited public statements made by the cross's supporters in the midst of the controversy surrounding its potential removal. See id. at 1119-20. Specifically, the court noted that the cross's "importance as a religious symbol has been a rallying cry for many involved in the litigation surrounding the [m]emorial," some of whom publicly characterized the campaign to save the cross as a "spiritual battle." Id. at 1119-20. Other "Christian advocacy groups" launched national petition campaigns for the cross and, at a meeting of the San Diego City Council, denounced their opponents as "Satanists" or "hate[rs] of Christianity." Id. at 1120. Still others characterized the efforts to maintain the cross as "saving [a] historic symbol of Christianity in America." Id.

In the instant case, the County's 2004 consideration of whether to replace the 1957 Seal and thereby remove the cross from the County's emblem was met with similar vocal public opposition. At the first of several public hearings regarding potential revisions to the 1957 Seal, members of the public objected to the removal of the Latin cross on religious grounds, with one characterizing the County's effort as "an attack on the body of Christ," Tr. Ex. 13, at 101, and another stating that "[i]f there's no cross, there's no compromise," id. at 86. Others called the cross "a symbol of the love of Christ" and a representation "not just [of] the passion that we are presenting today but [also] the passion of Christ." Id. at 187, 135. Such rhetoric, and the overall tone of the hearing, prompted Supervisor Burke to characterize the hearing as a "religious frenzy" and "as close to the inquisition as we have seen in the 21st century." Id. at 209, 211. She further noted that "if there's ever any question of what was being moved forward [by the Board] and

what the objection was to the vote that had been taken, it was clearly . . . a religious
one." Id. at 209.

Of course, the Court cannot impute the motives of the Board's constituents to
individual members of the Board. Trunk, 629 F.3d at 1119 n.19; Newdow, 597
F.3d at 1034 (noting that "grant[ing] a heckler's veto to anyone who ma[kes] just
enough noise in support of an enactment so as to defeat an otherwise valid
measure" would allow such measures to "be banned by the politically motivated
statements of some legislators (or even someone who is not in the legislature . . .
.)"). However, as the Ninth Circuit noted in Trunk, irrespective of "imputed intent,
the history of the [display] is relevant to determining its effect on the reasonable
viewer." Trunk, 629 F.3d at 1119 n.19. Thus, while evidence of the public's
religiously-motivated opposition to removing the cross "may not be relevant to [the
Board's] purpose [in removing it], it cannot be ignored in assessing the history and
context of the [use of the] [c]ross" on the County seal. Id.; see also Am. Humanist,
2014 WL 791800, at *13 (noting statements from "members of the community, as
well as the overall atmosphere at the . . . Council meeting sent a powerful message
that those who considered [using] the cross [on a memorial] to be inappropriate
were not welcomed"). Indeed, some outside organizations and members of the
public referenced this contentious history in either supporting or opposing the
County's effort to reintroduce the cross in 2014. See Tr. Ex. 52 (January 7, 2014
Board Meeting Minutes), at 378 ("I liked the old seal and I fought to keep it the
way it was . . . [and] am glad and sad at the same time to see that item back on the
agenda . . . ."), 380 ("[T]his is obviously a very controversial issue. This would be
a decade later that we are re-visiting it.").

Simply put, irrespective of the Board's purpose in adopting the 2004 Seal,
"[t]he starkly religious message of the [c]ross's supporters would not escape the
notice of the reasonable observer." Trunk, 629 F.3d at 1120. Nor would the

charged nature of the controversy and the publicity surrounding it escape a reasonable observer's notice.  See ACLU v. City of Stow, 29 F.Supp.2d 845, 852 (N.D. Ohio 1998) (noting few "even knew that the city had a seal" before it was legally challenged, but afterwards "almost everyone [knew] the seal ha[d] a Christian cross," and "heavy local publicity" surrounding the lawsuit and "the tension it has created in the community" only "exacerbated the effect of causing non-Christians . . . to feel like outsiders").  Armed with the memory of this message and of the County's decision to replace the 1957 Seal at substantial cost and despite vocal opposition, a reasonable observer in 2014, mindful of what history has to show, would not view the County's addition of a cross to the Mission as merely an "anodyne" government approval of religion.  Trunk, 629 F.3d at 1109.  Rather, a reasonable observer would likely view the County's willingness to expend upwards of $700,000 for the sole purpose of adding a cross to the depiction of the Mission as an "act[] that send[s] the stigmatic message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members."  Id. (internal quotation marks and citation omitted); c.f. id. at 1118-19 ("History would lead the reasonable observer to perceive a religious message in the Memorial.").

The County argues against this conclusion, asserting that plaintiffs "utterly ignore" both (1) "the context in which a cross appears on the 2014 Seal," as well as (2) "the context in which a reasonable observer would perceive a mission with a cross . . . ."  Opp'n at 28.  As to the first point, the County emphasizes that unlike governmental displays in which a cross "stands alone or as the [display's] centerpiece," the cross on the 2014 Seal is merely a "small, albeit significant architectural and historical feature of a large building [that] mak[es] it readily identifiable as a mission."  Id.  As to the second point, the County argues that a reasonable observer "would be aware that missions are routinely depicted with

crosses in all sorts of secular contexts, including on commemorative stamps issued by the post office." Id.  According to the County, "virtually every public school student in the state has received instruction on the importance of California missions to California history, including depictions of mission[s] with crosses on them." Id.  Thus, the County avers—albeit without reference to authority—that "most Californians" view such depictions as "part and parcel of the history of the state" and not as evincing "some isolated religious purpose." [24] Id.

For purposes of the Court's analysis here, the County's arguments are unavailing.  Specifically, the County fails to apply the Lemon test from "the perspective of an 'informed and reasonable' observer who is 'familiar with the history of ***the government practice at issue***.' "—i.e., familiar with the history of the County's display of its seal.  Trunk, 629 F.3d at 1110 (emphasis added) (citation omitted).  Instead, the County considers how an "objective observer," seemingly unaware of *the seal's* history but familiar with the history of California missions, might perceive the 2014 Seal's depiction of the Mission with a cross.  However, the Ninth Circuit has reminded courts "assessing the effect of a religious display" that "reasonable observers have reasonable memories" and cannot "turn a blind eye to the context in which [the particular governmental] ***policy*** arose."  Trunk, 629 F.3d at 1118 (emphasis added) (citing McCreary, 545 U.S. at 866) (internal quotation marks omitted).  Thus, the context and history of the County seal—and not merely the "history of the state," the "history of the missions," or "the history of County"—is crucial to assessing the County's challenged conduct here.  Opp'n at 28, 32; see Trunk, 629 F.3d at 1117 ("[W]e must gauge the overall impact of the Memorial in the context of *its* history and setting.") (emphasis added).

---

[24] Specifically, the County argues that "anyone acquainted with the history of the missions and well aware of their inclusion [in the] basic curriculum for students throughout the state, including displaying missions with crosses in textbooks, would not view the display of a mission with a cross on the County Seal as conveying a primarily religious as opposed to secular message signifying the importance of the Mission to the history of County."  Opp'n at 32.

Indeed, it is the unique history of the County's display of the seal that in large part distinguishes the instant case from Murray v. City of Austin, 947 F.2d 147 (5th Cir. 1991), and Weinbaum v. City of Las Cruces, 541 F.3d 1017 (10th Cir. 2008)—the only two cases defendants cite in which use of a Latin cross on a county or municipal seal was found to be permissible.  In Murray, a divided panel of the Fifth Circuit held that the city insignia of Austin, Texas, did not violate the Establishment Clause.  The insignia, adopted in 1919 and derived from Stephen F. Austin's family coat of arms, is topped by a small Latin cross flanked by a pair of wings.  Id. at 149-50.  The court first found that the City of Austin "did not have an improper purpose in adopting the insignia[,]" and the court further recognized the "long and unchallenged use" of the cross on the seal.  Id. at 158 (5th Cir. 1991).  Such circumstances are unlike the history of the adoption, removal, and re-addition of the cross on the seal in this action.  See also Van Orden v. Perry, 545 U.S. 677, 703 (2005) (Breyer, J., concurring) (distinguishing Van Orden—where the Supreme Court found a Ten Commandments display outside the Texas State Capitol to be permissible in part because the display stood for forty years without legal challenge—from McCreary, where "the short (and stormy) history of the courthouse Commandments' display demonstrate[ed] the substantially religious objectives of those who mounted them, *and the effect* of this readily apparent objective upon those who view them") (emphasis added);[25] Stow, 29 F. Supp. 2d at

---

[25]  "[T]he controlling opinion in Van Orden is, of course, that of Justice Breyer."  Card, 520 F.3d at 1018 n.10.  According to Justice Breyer, the fact that the Ten Commandments monument in Van Orden stood for forty years without legal challenge "suggest[ed] more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion . . . ."  Van Orden, 545 U.S. at 702 (Breyer, J., concurring); see also id. at 682 (plurality opinion) (noting that plaintiff sued "[f]orty years after the monument's erection and six years after [he personally] began to encounter the monument frequently").  In the instant case, no such period of tranquility existed, as the County's decision to introduce the cross to the 2004 Seal was met with swift opposition: plaintiffs filed suit on February 6, 2014, less than a month after the County passed its

50.

852 (distinguishing the seal in <u>Murray</u> "not in appearance but in derivation," noting "this derivation has constitutional implications").

In <u>Weinbaum</u>, the Tenth Circuit found the use of three Latin crosses on the City of Las Cruces's municipal seal to be permissible.  541 F.3d at 1035.  In reaching its decision, the court repeatedly emphasized that the crosses on the seal were inextricably intertwined with the City's name—which translates to "The Crosses"—a fact that "militate[d] against the argument that the symbol's effect is to endorse Christianity."  <u>See Weinbaum</u>, 541 F.3d at 1033-35 (finding that the "Las Cruces community uses the crosses the way Palo Alto uses the tall green tree"— that is, "to identify the cities by referring (via pictographic shorthand) to the cities' names").  The <u>Weinbaum</u> court also held that the Las Cruces seal "was [] understood to be secular by the residents of the City" and even "identif[ies] many secular businesses within the Las Cruces community."  <u>Id.</u> at 1035.  Indeed, "it is hardly startling that a City with the name 'The Crosses' would be represented by a seal containing crosses."  <u>Id.</u>  For reasons explained <u>supra</u>, the evidence in this case demonstrates that the County's effort to add the cross to the 2004 Seal is not likely to be understood by County residents as a secular action.

Accordingly, the Court concludes that an " 'informed and reasonable' observer who is 'familiar with the history of the government practice at issue' " would perceive the County's addition of the cross to the 2004 Seal to constitute approval or endorsement of a particular set of religious beliefs.  <u>Trunk</u>, 629 F.3d at 1110 (citation omitted).  Although each case necessarily turns on its own facts, most courts to have considered challenges to the use of crosses on county or municipal seals have similarly found them to be unconstitutional under <u>Lemon</u>'s second prong.  <u>See, e.g.</u>, <u>Friedman v. Bd. of Cnty. Comm'rs</u>, 781 F.2d 777, 779,

motion to add the cross.  <u>See</u> Dkt. 1 (Complaint).

51.

782 (10th Cir. 1985) (en banc) (finding cross on county seal to be unconstitutional where seal "convey[ed] a strong impression to the average observer that Christianity [was] being endorsed"); <u>Zion</u>, 927 F.2d at 1415 (finding crosses on two city seals to be "unconstitutional endorsements of a particular religious faith"); <u>Robinson v. City of Edmond</u>, 68 F.3d 1226, 1228, 1232, 1233 (10th Cir. 1995) (finding cross on city seal to be unconstitutional where "religious significance and meaning of the Latin or Christian cross are unmistakable" and "average observer would perceive . . . endorsement of Christianity" in viewing the seal); <u>Stow</u>, 29 F.Supp.2d at 851 (finding cross on city seal to be unconstitutional where the "inclusion of the cross in the seal necessarily excludes other religious beliefs or nonbeliefs and depicts Christianity as the religion recognized and endorsed by the people").  In light of the foregoing, the Court similarly concludes that the County's addition of the cross to the seal in the instant case violates <u>Lemon</u>'s second prong.

### 2.   **Plaintiffs Have Demonstrated Irreparable Injury**

The Ninth Circuit has made clear that the loss of constitutional freedoms "even for minimal periods of time, unquestionably constitutes irreparable injury" for purposes of issuing an injunction because such issues cannot be adequately remedied through damages.  <u>See, e.g.</u>, <u>Klein</u>, 584 F.3d at 1208 (finding irreparable harm where city's anti-littering ordinance violated plaintiff's rights under the California Constitution and First Amendment); <u>S.O.C., Inc. v. County of Clark</u>, 152 F.3d 1136, 1148 (9th Cir. 1998) (finding irreparable harm where plaintiff was likely to succeed on a First Amendment claim).  Plaintiffs in the instant action will therefore suffer irreparable injury in the absence of an injunction, as defendants have violated their constitutional rights, as explained <u>supra</u>. <u>See</u> <u>Klein</u>, 584 F.3d at 1208.

/ / /

/ / /

3.     **The Balance of Hardships Tips in Plaintiffs' Favor and a Permanent Injunction is in the Public Interest**

The fact that plaintiffs have "raise[d] serious First Amendment questions" likewise "compels a finding that . . . the balance of hardships tips sharply in [their] favor."  See Sammartano, 303 F.3d at 973 (internal quotation marks and citation omitted); see also Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1059 (9th Cir. 2006) (finding the balance of hardships to tip in favor of plaintiffs alleging that governmental aid "has the 'effect' of advancing religion").  Moreover, federal courts have consistently held that public interest concerns are implicated when a constitutional right has been violated because all citizens have a stake in upholding the Constitution.  See, e.g., Sammartano, 303 F.3d at 974 (recognizing "the significant public interest in upholding First Amendment principles").

## IV.

## CONCLUSION

In accordance with the foregoing, plaintiffs' motion for a permanent injunction is hereby **GRANTED**.  Plaintiffs are directed to prepare a form of judgment to be lodged with the Court in accordance with this decision and the Local Rules of this Court.

DATED: April 6, 2016

Christina A. Snyder

Honorable Christina A. Snyder
United States District Judge

53.

1

**V.**

**APPENDIX**

**Figure 1 (The 2014 Seal)**



**Figure 2 (The 2004 Seal)**



**Figure 3 (The 1957 Seal)**